UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAY 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| DAMON RASHAWN DIXON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Criminal Action No. 06-308 (RBW)

## MEMORANDUM OPINION[1]

Currently before the Court is the defendant's First <u>Ex Parte</u> Motion for Authorization of a

Subpoena Pursuant to Rule 17(c) ("Motion"). In this motion, the defendant asks the Court to

authorize a subpoena directing the Metropolitan Police Department of the District of Columbia

("MPD") to produce "data from 2004 through 2005 regarding the number of notices of infraction

issued in the District of Columbia to motorists for violating D.C. Municipal Regulation § 18-

422.8, [and] the race, age and gender of the motorists who were issued these notices of

infraction."[2] Motion at 1. The defendant contends that the information sought in this subpoena

is relevant to his claim "that law enforcement agents violated [his] Fourteenth Amendment rights

---

[1] This is a public copy of the Memorandum Opinion issued to the defendant on an <u>ex parte</u> basis on April 20, 2007.

[2] Although the defendant's motion also represents that the requested subpoena would seek "all MPD policies regarding the enforcement of [§ 18-422.8]," Motion at 1, the subpoena attached to the defendant's motion makes no mention of information relating to MPD policies. <u>See</u> Proposed Subpoena at 1.

by selectively enforcing traffic laws against him because of his race."[3] Id. ¶ 5. For the reasons

set forth below, the defendant's ex parte motion is denied.

The following facts are undisputed by the defendant. On November 1, 2005, three MPD

officers in a marked police vehicle observed the defendant's automobile traveling north on

Martin Luther King Avenue SE. Motion ¶ 1; Motion, Exhibit ("Ex.") 1 (November 1, 2005

Arrest/Prosecution Report) ("Arrest Report") at 1-2. According to the defendant, the officers

then stopped his automobile "because it displayed only one temporary registration tag issued by

the State of Maryland[,] and the tag was 'illegible from a dark colored tag cover obstructing the

tag.'"[4] Motion ¶ 1; see also Arrest Report at 2 (stating that the automobile had "only one tag . . .

displayed on the rear of the vehicle[,] . . . [which] was illeg[i]ble from a dark colored tag cover

obstructing the tag"). Upon approaching the driver's side of the automobile, one of the officers

allegedly "smelled a strong odor of PCP fumes [emanating] from within." Arrest Report at 2.

Two of the officers then "observe[d] a clear glass vial containing suspected PCP liquid in plain

view sitting in the center console area. The bottle was consist[e]nt with the packaging of PCP

which is recovered from the Barry Farms area [of the District of Columbia] where [the

defendant] was driving." Id. The report continues:

> [One officer] asked the [defendant] what was in the vial[,] and the [defendant] stated
> "cologne." [The defendant] was removed from the vehicle and the bottle was
> retr[ie]ved. The bottle [emitted] a strong odor of PCP. [The defendant] was placed
> under arrest[,] and [during a] search incident to [the] arrest, [the third officer]
> recovered approximately $5675 in U.S. Currency from [the defendant's] pants
> pocket[,] which was divided into five bundles (approximately $1000 each bundle).

_____

[3] The defendant is African-American. See Motion ¶ 8.

[4] The arrest report does not expressly state that the defendant's automobile was pulled over because of a
perceived traffic violation. See generally Arrest Report at 1-2.

> Also recovered from the vehicle inside the center console were [two] [l]emon [j]uice bottles[,] each containing approximately [eight] ounces of PCP liquid, for a total of [sixteen] ounces.

Id. The defendant was charged by the police with the possession of PCP with intent to distribute, but was not charged with violating § 18-422.8 or any other traffic regulation.[5] Id. at 1.

As the defendant states, Federal Rule of Criminal Procedure 17(c) "governs the issuance of subpoenas for [the] production of documents and other items in criminal cases." Motion ¶ 4; see also Fed. R. Crim. P. 17(c). Because Rule 17(c) was "not intended to provide a means of discovery," a party requesting production of documents prior to trial under this Rule must "satisfy exacting standards of (1) relevancy; (2) admissibility; [and] (3) specificity." Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367, 386 (2004) (quoting United States v. Nixon, 418 U.S. 683, 698, 700 (1974)) (internal quotation marks omitted); see also id. (noting that the burden is on the party seeking the Rule 17(c) subpoena to demonstrate that its request meets the "demanding requirements" of the Rule).

Here, the defendant seeks authorization for a subpoena directing the MPD to provide two years of statistical data regarding the enforcement of D.C. Municipal Regulation § 18-422.8, which states that "[n]o person shall operate a vehicle where the identification tag's identifying numbers or letters are covered with glass, plastic, or any type of material or substance." Motion ¶ 3 (quoting DCMR § 18-422.8 (2007)) (internal quotation marks omitted). Specifically, the defendant requests "the race, age and gender of the motorists who were issued . . . notices of

---

[5] The defendant was ultimately indicted on charges of (1) conspiracy to possess with intent to distribute and to distribute in excess of 100 grams of PCP, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iv), 846 (2000); and (2) possession with intent to distribute approximately 388 grams of a mixture or substance containing a detectable amount of PCP, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B). Indictment at 1-3.

infraction [for violating § 18-422.8]" as well as "all MPD policies regarding the enforcement of this regulation." Id. at 1.  The defendant contends that "[this] information is relevant to support a motion to dismiss the [i]ndictment [against him] on the ground that law enforcement agents violated [his] Fourteenth Amendment rights by selectively enforcing traffic laws against him because of his race."[6]  Id. ¶ 5.  The Court disagrees.

Under the Federal Rules of Evidence, relevance is assessed by determining whether a piece of evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  Accordingly, in order to satisfy Rule 17(c)'s "exacting standard[] of . . . relevancy," Cheney, 542 U.S. at 386 (internal quotation marks and citation omitted), the defendant must demonstrate that the information he seeks through his subpoena tends to make the existence any fact underlying his claim of selective enforcement—that is, that the MPD officers "selectively enforc[ed] traffic laws against him because of his race," Motion ¶ 5—either more or less probable than it would otherwise be.  He has plainly failed to do so.

All decisions to pursue perceived violations involve a measure of judgment and discretion on the part of individual law enforcement officers, and a selective enforcement claim "asks a court to exercise judicial power over a 'special province' of the Executive." United States v.

_____

[6] The defendant also asserts that "[the] evidence . . . would be admissible at a hearing on a motion to suppress the evidence allegedly [recovered from his vehicle] by the police . . . on November 1, 2005." Motion ¶ 5. The Supreme Court has "never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution [or enforcement] on the basis of his race." United States v. Armstrong, 517 U.S. 456, 461 n.2 (1996). Because the Court concludes that the defendant has not adequately justified his request for an ex parte subpoena under Rule 17(c) in any event, it is unnecessary to determine whether a showing that the officers selectively enforced § 18-422.8 by stopping the defendant because of his race, thus violating the Fourteenth Amendment, would, or could, constitute grounds for suppression of the evidence recovered from the defendant's car, the dismissal of the indictment, or any other remedy in the criminal context.

Armstrong, 517 U.S. 456, 464 (1996) (citation omitted).  As the Sixth Circuit has observed,

"[j]udicial interference with law enforcement discretion might induce police officers to protect

themselves against false accusations in ways that are counterproductive to fair and effective

enforcement of the laws, such as by directing law enforcement resources away from minority

neighborhoods."  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006)

(internal quotation marks and citation omitted).  Moreover, "the foremost method of enforcing

traffic and vehicle safety regulations is acting upon observed violations," Whren v. United States,

517 U.S. 806, 817 (1996) (internal quotation marks, ellipsis, and citation omitted), and "police

enforcement practices, even if they could be practicably assessed by a judge, vary from place to

place and from time to time," id. at 815.

      Nevertheless, the discretion of law enforcement officers is by no means unlimited.

Through the Equal Protection Clause of the Fourteenth Amendment, "the Constitution prohibits

selective enforcement of the law based on considerations such as race."  Whren, 517 U.S. at 813

(also observing that "the constitutional basis for objecting to intentionally discriminatory

application of laws is the Equal Protection Clause, not the Fourth Amendment"); see also City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (stating that the Equal Protection

Clause "is essentially a direction that all persons similarly situated should be treated alike")

(citation omitted).  Although neither the Supreme Court nor the District of Columbia Circuit

have articulated a framework for evaluating the sufficiency of a motion for Rule 17(c) discovery

on a selective enforcement claim under the Equal Protection Clause, other Circuits have in such

cases sensibly applied the standard set forth by the Supreme Court in United States v. Armstrong,

517 U.S. 456 (1996), regarding the showing necessary to obtain discovery on a claim of selective

prosecution. See, e.g., Alcaraz-Arellano, 441 F.3d at 1264-65 (applying Armstrong standard to selective enforcement claim); Bennett v. City of Eastpointe, 410 F.3d 810, 818 (6th Cir. 2005) (same); Johnson v. Crooks, 326 F.3d 995, 999-1000 (8th Cir. 2003) (same); United States v. Barlow, 310 F.3d 1007, 1010-12 (7th Cir. 2002) (same); Brown v. City of Oneonta, 221 F.3d 329, 336-39 (2d Cir. 2000) (same); United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996) (same). And this Court agrees with those Circuits that "a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that Armstrong outlines for selective prosecution claims." Barlow, 310 F.3d at 1010 (citations omitted).

To prevail on a claim of selective enforcement, a defendant must therefore demonstrate that the challenged action "had a discriminatory effect and that it was motivated by a discriminatory purpose." Armstrong, 517 U.S. at 465 (internal quotation marks and citations omitted). Thus, "[t]o establish a discriminatory effect in a race case, the [defendant] must show that [the relevant law or policy was not enforced against] similarly situated individuals of a different race." Id. Moreover, where, as here, the defendant claims that a facially neutral law or policy has been applied in an racially discriminatory manner, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 390 (1982) (internal quotation marks and citation omitted). Rather, "[e]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." Id. (internal quotation marks and citations omitted); see also Wayte v. United States, 470 U.S. 598, 608 n.10 (1985) (stating that "[a] showing of

6

discriminatory intent is . . . necessary when the equal protection claim is [not] based on an overtly discriminatory classification"). Thus, "[a] defendant challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." Alcaraz-Arellano, 441 F.3d at 1264 (internal quotation marks and citation omitted). This standard is "a demanding one," Armstrong, 517 U.S. at 463, and "the showing necessary to obtain discovery [on a selective enforcement claim] should itself be a significant barrier to the litigation of insubstantial claims," id.

Applying "ordinary equal protection standards," it is clear that the information sought through the defendant's Rule 17(c) motion is not relevant to the elements required to sustain his claim of selective enforcement. Armstrong, 517 U.S. at 465 (internal quotation marks and citation omitted). Even if the data regarding the issuance of notices of infraction for violations of § 18-422.8 were to demonstrate, as the defendant apparently believes it would, that a disproportionate number of notices of infraction for violation of the regulation prohibiting tinted registration tags are issued to African-American motorists, see Motion ¶¶ 7-9, such evidence would not lead a jury to "reasonably infer that the law enforcement officials [responsible for stopping the defendant's vehicle] were motivated by a discriminatory purpose" in doing so. Alcaraz-Arellano, 441 F.3d at 1264 (internal quotation marks and citation omitted). "When the claim is selective enforcement of the traffic laws or a racially motivated arrest, the [claimant] must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." Johnson, 326 F.3d at 1000 (citations omitted); see also Barlow, 310 F.3d at 1010 (stating that an individual bringing a selective

7

enforcement claim "must demonstrate that a law or regulation was enforced against him, but not against similarly situated individuals of other races") (citations omitted). Thus, the defendant would need to demonstrate that other, similarly situated motorists of different races were not stopped by the MPD—and, specifically, by the three MPD officers involved in this case—despite driving automobiles with "only one tag . . . displayed on the rear of the vehicle[,] . . . [which] was illeg[i]ble from a dark colored tag cover obstructing the tag." Arrest Report at 2; see Armstrong, 517 U.S. at 458 (finding that the defendants had "failed to satisfy the threshold showing [for a selective prosecution claim because] [t]hey failed to show that the [g]overnment declined to prosecute similarly situated suspects of other races"). However, the information sought by the defendant through his requested subpoena does not, and cannot, purport to do so. First, using statistical data "regarding the number of notices of infraction issued in the District of Columbia to motorists for violating D.C. Municipal Regulation § 18-422.8, [and] the race, age and gender of the motorists who were issued these notices of infraction," Motion at 1, it would be impossible to determine how many motorists of each race were not issued such notices even though their vehicles were similarly in violation of the regulation. See Alcaraz-Arellano, 441 F.3d at 1264 (stating that a defendant "claim[ing] selective enforcement must make a credible showing that a similarly situated individual of another race could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested") (internal quotation marks and citation omitted). More to the point, the Court could not draw conclusions (or even reasonable inferences) regarding the motivating reasons for the actions of the specific MPD officers involved in this case by considering general MPD data concerning the issuance of notices of infraction for violations of § 18-422.8. See Johnson, 326 F.3d at 1000 (concluding that the

8

claimant "offered no evidence that [the law enforcement officer] [did] not stop non-African Americans under similar circumstances"); Barlow, 310 F.3d at 1012 (stating that "[t]o meet his burden under Armstrong, [the defendant] needed to present evidence that the [law enforcement] agents observed whites engaging in the same behavior as [him] . . . but chose not to [enforce the applicable law against them]") (citation omitted). This is particularly the case when the defendant himself was not issued a notice of infraction and thus presumably would not fall within the parameters described by the requested subpoena. See Motion ¶ 9 (conceding that the officers . . . did not issue a notice of infraction to [the defendant] for violating [§ 18-422.8]"). Furthermore, to the extent the defendant suggests that his vehicle was not in violation of § 18-422.8, see Motion ¶¶ 3, 9, a subpoena seeking data regarding motorists who were in violation of the regulation is even less relevant to the defendant's claim of selective enforcement.[7] Thus, "[w]ithout evidence of both discriminatory effect and discriminatory intent on the [officers'] part,

---

[7] Regardless of whether the identifying letters or numbers of the defendant's temporary identification tag were actually "covered with glass, plastic, or any type of material or substance" in violation of § 18-422.8, both the traffic stop and the subsequent seizure of the defendant's PCP appear to be clearly justified by the facts as they have been presented by the defendant. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810 (citations omitted); see also United States v. Mapp, 476 F.3d 1012, 1016 (D.C. Cir. 2007) (same). As in Whren, which, like this case, "involved a traffic stop as the prelude to a plain-view sighting and arrest on charges wholly unrelated to the basis for the stop," Whren, 517 U.S. at 812, the Court has no reason to doubt that the MPD officers had probable cause to believe that the defendant was in violation of the traffic regulation at issue when his vehicle was stopped. See Arrest Report at 1-2; see also Arkansas v. Sullivan, 532 U.S. 769, 770 (2001) (reversing suppression of evidence where defendant was stopped "for speeding and for having an improperly tinted windshield" and then "[arrested and] charged with various state-law drug offenses" after methamphetamine and drug paraphernalia were recovered from his automobile). In addition, once the officers had stopped the defendant's vehicle, the seizure of the defendant's PCP was clearly justified by the plain view doctrine, given "the strong odor of PCP fumes [emanating] from within" and the "clear glass vial liquid containing suspected PCP . . . in plain view sitting in the center console area." Arrest Report at 2; see, e.g., Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (stating that "if police are lawfully in a position from which they view an object, if [the object's] incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, it may be seized without a warrant") (citations omitted); see also United States v. Pindell, 336 F.3d 1049, 1055 n.4 (D.C. Cir. 2003) (noting that "the 'immediately apparent' requirement is satisfied if the police have probable cause to believe that an object in plain view is contraband without conducting some further search of the object") (quoting Dickerson, 508 U.S. at 375) (internal quotation marks omitted).

[the defendant cannot] make the threshold showing required in Armstrong," and the Court must therefore deny his ex parte application for a Rule 17(c) subpoena.

**SO ORDERED** this 10th day of May, 2007.[8]

REGGIE B. WALTON
United States District Judge

---

[8] As noted above, this Memorandum Opinion was issued to the defendant on an ex parte basis on April 20, 2007. However, because the issues presented by the defendant's ex parte Rule 17(c) motion are largely matters of first impression in this jurisdiction, the Court directed the defendant to show cause by May 4, 2007, why the contents of his requested Rule 17(c) subpoena should remain ex parte, and why this Memorandum Opinion should not be made available for publication. After considering the defendant's response, the Court concludes that it was unnecessary in this instance for the defendant to file his Rule 17(c) application ex parte. Accordingly, as set forth in the accompanying May 10, 2007 Order, the Court is now making this Opinion available for publication.