UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO. 06-308 (RBW) |
| : | |
| DAMON RASHAWN DIXON : | |
| : | |
| _____: | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS**

Now comes Attorney General Alberto Gonzalez, by and through Special Attorneys General, Paul Camilletti and Thomas O. Mucklow and in response to the Defendant's Motion to Suppress his Statements, (Document No. 35) states that it objects to the motion for the following reasons:

1. On November 1, 2005 officers of the Metropolitan Police Department stopped a 2005 Silver Dodge Magnum automobile traveling in the Northbound lane on Martin Luther King Avenue, SE, Washington, DC with an illegible tag obstructed by a dark color material. Defendant, Damon Dixon, was the sole occupant of the vehicle and in the driver's seat. As one of the officers approached the driver's side of the vehicle, he smelled a strong odor of PCP. The officer and his sergeant observed a clear glass vial containing suspected PCP, a clear liquid, in plain view on the center console. They also recognized the clear glass vial as consistent with the way that PCP is packaged in the neighborhood where the vehicle was stopped. The first officer asked Defendant, Dixon, what was in the vial, and Dixon replied "cologne." Dixon was removed from the vehicle, and the bottle was retrieved. The bottle emitted a strong odor of PCP. Dixon was placed under arrest. A search incident to the arrest revealed $5,675.00 in United States currency in Dixon's pants pocket. The

      currency was divided into five bundles of approximately $1,000.00 each. Recovered from the center console of the vehicle were two lemon juice bottles each containing approximately eight ounces of PCP for a total of 16 ounces.

2.   On November 1, 2006, Dixon was arrested by agents of the Federal Bureau of Investigation pursuant to a warrant issued as a result of his Indictment in the instant case. Dixon was advised of the identities of the agents and the purpose of the interview, indicated that he would be willing to be interviewed, was read his rights and executed an Advice of and Waiver of Rights form. See attached. In the interview, Dixon indicated:

That he has known Darnell Jackson since approximately 1984. Dixon indicated that he would purchase approximately 8 ounces of PCP from Jackson at a time. When Dixon purchased PCP from Jackson, Jackson would give Jackson the PCP in real lemon juice bottles. Dixon stated he did not remember giving him the two real lemon bottles of PCP that he had in his possession on the night of his arrest in November, 2005. Dixon said it could have been Jackson or someone else. Dixon stated he would sometimes sell Jackson a couple of ounces of PCP.

Dixon further stated that currently he was purchasing PCP from an individual name, "Big." Dixon stated he meets Big in Queens, New York. Dixon stated he is currently buying gallon quantities of PCP from Big for a price of $23,000.00. Upon obtaining PCP from Big, Dixon stated that he does not cut or add anything else to the PCP mixture. Dixon stated he goes to New York to meet with Big every couple of months. Dixon stated that when he traveled to New York to purchase PCP, he would take the Grey Hound bus up and back. Dixon stated that when he brought PCP back from New York, he would hide the PCP in different places to include the Woods in surrounding areas. Dixon stated the last time he went to New York to purchase PCP from Big was a month and a half ago. Dixon said that it usually took him that period of time to sell one gallon of PCP. Dixon also would only go up to New York when he knew that Big had the PCP available.

>Dixon was asked about his bank deposits during the past year. Dixon stated that these deposits were to pay Big. Dixon stated there was a time when Big was fronting Dixon PCP. Dixon deposited $8,000.00 to $9,000.00 into Big's account on approximately three or four occasions.
>
>Dixon stated that he would write down the names and running talley of the money that is owed to him from PCP sales. Dixon said he kept that paper with all the names and quantities inside his Lexus. Dixon sells the PCP at $400.00 per ounce.
>
>Dixon further stated that he sells PCP locally to a female who goes by the name of Mo. Mo is from the Clay Terrace area. She purchases one-half gallon of PCP at a time. Mo buys the half gallon of PCP from Dixon for a price of $17,000.00. Dixon added that Mo currently owes him $4,000.00 as she has just purchased a half gallon from Dixon two weeks ago (Mid-October, 2006). Dixon stated that at that time, Mo had given Dixon $13,000.00. Dixon did not know exactly where Mo lived and only said that she would be driving rental vehicles when he met with her.
>
>Dixon stated that he was not employed and had not worked in a long time. He was asked where he had obtained the $3,374.00 which he had in his pocket at the time of his arrest (November 1, 2006). Dixon said that he had obtained the money from sales of PCP. Dixon was asked if he sold any other drugs than PCP. Dixon said that back in 1995 he was selling crack cocaine but he got out of that because there was no money in it.

The one word statement given by Dixon on November 1, 2005, the date of his traffic stop, would appear to be controlled by *Berkemer v. McCarty*, 468 U.S. 420 (1984).

With regard to prearrest statements made by a motorist during a traffic stop, the Supreme Court observed, "first, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be

allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from station house interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Id.* pp. 437-438. Recognizing that a "traffic stop is more analogous to a so-called 'terry stop'. . .than to a formal arrest." The Supreme Court held "that persons temporarily detained pursuant to [traffic] stops are not "in custody" for the purposes of *Miranda*. *Id*. p. 439.

In this case, the policeman's inquiry: what's in the vial? and Dixon's response "cologne" fall under the ruling in *Berkemer v. McCarty*, *Supra*. "The officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. [In this case that there was PCP in the car]. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Id.* pp. 439-440.

With regard to the statement given on November 1, 2006, after Dixon's arrest upon the return of this Indictment, it is clear that Dixon was advised of and waived his Miranda rights. See attached. A defendant may waive the rights conveyed in the Miranda warnings, "provided the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). (Quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). In recognizing that the right to remain silent may be waived, the Supreme Court observed that "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and

the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Id.* p. 421 (quoting *Fare v. Michael Cee*, 442 U.S. 707, 725 (1979).

When applied to this case, it is clear that Defendant, Dixon, waived his Miranda warnings on November 1, 2006, the day of his arrest. See attached.[1]

>                         RESPECTFULLY SUBMITTED,
>                         PAUL T. CAMILLETTI
>                         THOMAS O. MUCKLOW
>                         SPECIAL ATTORNEYS TO THE UNITED
>                         STATES ATTORNEY GENERAL
>
> By:    /s/ Paul T. Camilletti
>        Paul T. Camilletti
>        Thomas O. Mucklow
>        Assistant United States Attorneys
>        217 West King Street
>        Suite 400
>        Martinsburg, WV 25401
>        (304) 262-0590

---

[1] The defendant may be confused concerning this waiver of right because the narrative of the FBI 302 relating this interview begins with a reference to the date of November 11, 2006. This is clearly a typographical error as the reference at the bottom of the 302 refers to an investigation on November 1, 2006 and the advice and waiver of rights generated during that interview and attached clearly validate November 1, 2006 in three places. It is the writer's experience that these documents are commonly transcribed by third persons who were not present during the interview which fact may explain the typographical error.

CERTIFICATE OF SERVICE

I, Paul T. Camilletti, Special Attorney to the United States Attorney General for the District of Columbia hereby certify that on the 24th day of July, 2007, the foregoing Government's Response to Defendant's Motion to Suppress Statements was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Steven J. McCool
Attorney at Law
1776 K. Street, N.W., Suite 200
Washington, D.C. 20006

RESPECTFULLY SUBMITTED,
PAUL T. CAMILLETTI
THOMAS O. MUCKLOW
SPECIAL ATTORNEYS TO THE UNITED
STATES ATTORNEY GENERAL

By:   /s/ Paul T. Camilletti
Paul T. Camilletti
Thomas O. Mucklow
Assistant United States Attorneys
217 West King Street
Suite 400
Martinsburg, WV 25401
(304) 262-0590

FD-395 (Rev. 11-5-02)

## ADVICE OF RIGHTS

Place __WFO__
Date __11/1/2006__
Time __12:21 pm__

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed X _[signature]_

Witness: SA _[signature]_, FBI, WFO, 11/1/2006
Witness: SA _[signature]_, FBI, WFO, 11/1/06
Time: __12:23__