IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  06-308 (RBW) |
| | ) | |
| DAMON RAWSHAWN DIXON | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT DAMON DIXON'S MOTION FOR A JUDICIAL RE-DESGINATION
TRANSFER RECOMMENTDATION AND INCOPORTATED
<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

  Defendant, Damon Dixon, by and through undersigned counsel, respectfully moves this Court to recommend that the Bureau of Prisons ("BOP") evaluate him for re-designation transfer under the criteria set forth in BOP Program Statement 5100.08.  In support of this motion, Mr. Dixon submits the following.

  1. On September 12, 2007, Mr. Dixon entered a guilty plea before this Court to one count of unlawful possession with intent to distribute phencyclidine.

  2. On December 13, 2007, this Court sentenced Mr. Dixon to a term of 78 months imprisonment.

  3. While incarcerated pending sentencing, Mr. Dixon demonstrated his desire to lead a law abiding life by studying for and passing his GED examination and by requesting drug treatment.  Mr. Dixon has also expressed a strong desire to receive vocational training, so he can support his family after he is released.

  4. On December 13, 2007, the Court recommended that Mr. Dixon participate in the BOP's Residential Drug Abuse Treatment Program ("RDAP").

5.       Following his sentencing, the BOP designated Mr. Dixon to serve his sentence at the Rivers Correctional Institution ("RCI") in Winton, North Carolina.

6.       The vocational training and drug treatment programs at RCI are non-existent.

7.       BOP Director Harley G. Lappin acknowledged this during his October 16, 2007 testimony before the U.S. House of Representatives, Federal Workforce, Postal Service and the District of Columbia Subcommittee. *See* Exhibit 1, at 7.

8.       On October 15, 2007, the *Washington Post* reported that "[t]raining [at RCI] that leads to jobs is limited to a heating and ventilation class that serves only in inmates who are 18 to 25 years old." *See* Exhibit 2. Mr. Dixon is beyond that age group.

9.       One of the goals of the Sentencing Reform Act is to provide reasonable rehabilitative services to Mr. Dixon.

10.      Given Mr. Dixon's strong desire for rehabilitation and RCI's inability or unwillingness to offer the programs that would reasonably allow Mr. Dixon to achieve this goal, Mr. Dixon asks the Court to grant his motion and to recommend that the BOP place Mr. Dixon in a more appropriate facility.

WHEREFORE, for all the foregoing reasons, and any others which may appear to this Court, Mr. Dixon respectfully requests that the Court grant the instant motion.

                                            Respectfully submitted,

                                            _____/s/_____
                                            STEVEN J. McCOOL
                                            D.C. Bar No. 429369
                                            MALLON & McCOOL, LLC
                                            1776 K Street, N.W., Suite 200
                                            Washington, D.C. 20006
                                            (202) 393-7088

                                            *Counsel for Damon Dixon*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 14, 2008, a copy of the foregoing was served through the electronic document filing system of the United States District Court for the District of Columbia to the following attorneys of record in the above-captioned:

Paul T. Camilletti
U.S. Attorney's Office for the
 Northern District of West Virginia
217 West King Street
Suite 400
Martinsburg, WV 25401

Tom Mucklow
U.S. Attorney's Office for the
 Northern District of West Virginia
217 West King Street
Suite 400
Martinsburg, WV 25401

           _____/s/_____
           STEVEN J. McCOOL



# Department of Justice

STATEMENT
OF
HARLEY G. LAPPIN
DIRECTOR
FEDERAL BUREAU OF PRISONS


BEFORE THE
FEDERAL WORKFORCE, POSTAL SERVICE, AND
THE DISTRICT OF COLUMBIA SUBCOMMITTEE
OF THE
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

U.S. HOUSE OF REPRESENTATIVES



CONCERNING

INMATE PROGRAMS AT RIVERS CORRECTIONAL INSTITUTION



PRESENTED ON

OCTOBER 16, 2007

Statement of Harley G. Lappin
Director, Federal Bureau of Prisons
Before the Federal Workforce, Postal Service, and
the District of Columbia Subcommittee
of the
Committee on Oversight and Government Reform
U.S. House of Representatives
October 16, 2007

Good Morning Chairman Davis and Members of the Subcommittee.

I appreciate the opportunity to appear before you today to discuss the role of the Bureau of Prisons in the confinement, care, and treatment of offenders from the District of Columbia.

The Bureau of Prisons (BOP) is responsible for the care and custody of more than 200,000 inmates in 114 Federal institutions and a number of contract facilities throughout the United States. We are responsible for the incarceration of inmates who have been sentenced to imprisonment for Federal crimes and the detention of individuals awaiting trial or sentencing in Federal court.  In addition, based on a 1997 Federal law, our agency is also responsible for the District of Columbia's sentenced felon inmate population.

The National Capital Revitalization and Self-Government Improvement Act of 1997 (Title XI of the Balanced Budget Act of 1997 (P.L. 105-33)) required the BOP to assume responsibility for the incarceration of District of Columbia (D.C.) sentenced felons

2

by December 31, 2001. The law also requires us to treat D.C. Superior Court inmates as much like Federal inmates as possible, stating: "Such persons shall be subject to any law or regulation applicable to persons committed for violations of laws of the United States consistent with the sentence imposed."

Immediately after passage of the Act, the BOP began working with the D.C. Department of Corrections to ensure that the transfer of inmates would be orderly and efficient. Our ambitious construction schedule and our use of some State correctional institutions and some privately-operated facilities allowed us to meet the Act's requirement prior to the deadline; the transfer was completed in November 2001.

The Act further required the BOP to house at least 2,000 D.C. sentenced felons in privately-operated facilities by December 31, 1999, and to confine 50 percent of D.C. sentenced felons in private facilities by September 30, 2003.

The privatization requirements of this Act were superceded by a provision in Public Law 106-553 (enacted on December 21, 2000) which provides that, beginning in fiscal year 2001 and thereafter, the BOP may confine in privately-operated prisons only those D.C. inmates who are determined to be appropriate for

such placement based on Federal classification standards and any threat they may pose to public safety.

After the Revitalization Act passed in 1997, we initiated a process to procure private contract beds as required by the statute.  We divided the procurement into two phases for two separate contract facilities.  The first phase of the procurement resulted in a 1999 contract award for a facility in Philipsburg, Pennsylvania.  Originally, the facility was slated to confine and manage 300 female D.C. inmates of various security levels, 350 minimum-security male D.C. inmates, and 350 D.C. Youth Reform Act inmates of various security levels.  The contract experienced some delays due to environmental and legal challenges.  We reassessed our needs and our decision regarding the population that would be confined at the Philipsburg facility.  We determined that the population should consist of 1,300 low-security male inmates -- primarily low-security Federal criminal aliens and D.C. inmates.  Construction of the Moshannon Valley Correctional Center began in October 2004, and the facility opened in April 2006.

The second phase of the procurement resulted in a contract with the Rivers Correctional Institution in Winton, North Carolina.  The original contract for this facility called for the

confinement and management of approximately 1,200 low-security D.C. inmates.  The Statement of Work for the Rivers facility allows for the designation to this institution of other low-security inmates.  The contract was awarded in March 2000, and the facility opened in March 2001.  Rivers Correctional Institution began receiving inmates in April 2001.

In February of this year, based partly on tensions between the criminal aliens and D.C. inmates at the Moshannon Valley Correctional Center, we transferred all of the D.C. inmates out of that facility.  The vast majority of these D.C. inmates were redesignated to Rivers Correctional Institution.

Currently, Rivers Correctional Institution confines approximately 1,300 inmates -- approximately 700 D.C. inmates and approximately 600 criminal aliens.  The Moshannon Valley Correctional Center now confines approximately 1,500 low-security Federal criminal aliens.

**Inmate Programs**

The mission of the Bureau is to provide safe, secure, humane, and cost-effective confinement of inmates, and to provide opportunities for offenders to gain the skills that they will need to return to society as productive and law-abiding citizens.

-4-

Our programs stress the development of the work skills and life skills needed to enhance employment upon release and to help inmates maintain a crime-free lifestyle.

Our inmate programs include work, education, vocational training, substance abuse treatment, opportunities for religious observance, counseling, and other programs that impart essential life skills and pro-social values. We also provide a variety of other structured activities that are designed to teach inmates productive ways to use their time. Preparation for reentry begins in the first days of an inmate's incarceration. The vast majority of our inmate programs and services are geared toward helping inmates prepare for their eventual release.

The core inmate programs at all BOP facilities include:
- Work Programs -- which includes work in institution jobs and in the Federal Prison Industries Program.
- Education -- including literacy classes (to obtain a General Educational Development certificate), English as a Second Language, adult continuing education, parenting classes, recreation activities, wellness education, and library services.
- Occupational Training
- Vocational Training (VT)

- Substance Abuse Treatment -- including drug education, nonresidential treatment, residential treatment, and community transition treatment.
- Observance of Faith and Religion
- Psychology Services and Counseling
- Visiting, Telephone, and Correspondence Privileges
- Release Preparation -- which includes institution-based programs and use of residential reentry centers.

In addition, many institutions offer additional pro-social values programs to address a variety of needs among certain segments of the inmate population (including younger offenders and high-security inmates). These programs focus on inmates' emotional and behavioral responses to difficult situations and emphasize life skills and the development of pro-social values, respect for self and others, responsibility for personal actions, and tolerance.

We also continue the implementation of our Inmate Skills Development initiative. This is a strategy the BOP has undertaken to unify our inmate programs and services into a comprehensive reentry strategy. The three principles of the Inmate Skills Development strategy are: (1) inmate participation in programs must be linked to the development of relevant inmate

reentry skills; (2) inmates should acquire or improve a skill identified through a comprehensive assessment, rather than simply completing a program; and (3) resources are allocated to target inmates with a high risk for reentry failure.

D.C. inmates confined in the Rivers Correctional Institution are offered the opportunity to participate in programs; however, we now believe that the vocational training and residential drug abuse treatment programs are inadequate.  We have identified a need to expand vocational training programs, and we intend to enhance and certify the residential substance abuse treatment program so that more low-security D.C. inmates can receive such treatment at a location that is closer to the District.

In November 2006, we evaluated the range of programs at Rivers Correctional Institution and identified a specific need for enhanced vocational training.  In December, we asked the GEO Group Inc., the company that operates the facility, to submit proposals to increase programming that these facilities.

We received three proposals from the GEO Group to implement a plumbing vocational training program, a carpentry VT program, and an electrical VT program; and in February 2007 we focused our efforts on these proposals.  In March, we sent the three

proposals to the Court Services and Offender Supervision Agency (CSOSA) for their review. CSOSA's review is to help to ensure the programs will meet appropriate national curriculum standards and will provide D.C. offenders with marketable skills. CSOSA will also help ensure that links to continuing vocational, apprenticeship, or on-the-job training will be in place for inmates who do not complete the program during incarceration.

**Residential Drug Abuse Treatment and Reduction in Term of Imprisonment**

The BOP has provided some form of substance abuse treatment to inmates for decades. The Violent Crime Control and Law Enforcement Act of 1994 mandates that the BOP provide residential substance abuse treatment to all eligible prisoners with priority based on proximity to release date and allows the BOP to reduce the term of imprisonment for nonviolent offenders who successfully complete the residential program.

While the statute applies only to inmates convicted in Federal court, in our effort to treat D.C. Superior Court inmates as much like Federal inmates as possible, we offer residential drug abuse treatment to D.C. Superior Court inmates as well. These offenders have participated in residential treatment, and they have been eligible for many of the incentives we offer -- the exception is the possible reduction in their term of

imprisonment. However, changes to that exception are forthcoming.

On May 24, 2005, the D.C. City Council passed the Omnibus Public Safety Ex-Offender Sufficiency Reform Amendment Act of 2004. Among its several provisions, this law allows non-violent, D.C. Code offenders to receive a reduction of up to 1 year off their term of imprisonment upon successful completion of the residential substance abuse treatment program. We published a proposed rule to implement this law on November 2, 2006. We have composed a final rule and will publish the rule in conjunction with issuing our own updated policy, which is currently in the final review and clearance process.

**Conclusion**

Mr. Chairman, this concludes my formal statement. I would be pleased to answer any questions you or other Members of the Subcommittee may have.

washingtonpost.com

| NEWS | OPINIONS | SPORTS | ARTS & LIVING | Discussions | Photos & Video | City Guide | CLASSIFIEDS | JOBS | CARS | REAL ESTATE |

# N.C. Prison Doesn't Serve D.C. Inmates Well, Critics Say

By Robert E. Pierre
Washington Post Staff Writer
Monday, October 15, 2007; B01

WINTON, N.C. On the surface, Rivers Correctional Institution is much as District leaders imagined a decade ago, when they asked the federal government to take control of its prisoners: a safe, well-maintained facility that doesn't cost the city a penny.

The deal sent inmates, once sequestered at the Lorton complex in Northern Virginia, anywhere the Federal Bureau of Prisons could find space. Today, the District's nearly 7,000 inmates are spread across 75 institutions in 33 states.

Rivers, however, was built specifically to house inmates from the District. They typically fill at least two-thirds of its 1,400 beds. Many are in on drug and parole violations. The average stay is two years.

Busloads of wives, mothers and children trek here on a four-hour drive passing fields laden with watermelons, pumpkins and rows of cotton.

The rural North Carolina prison, run by the private GEO Group, has become a symbol for what inmates, their families and city leaders say is harsher treatment of D.C. inmates in federal prisons compared with other inmates. Drug treatment and job training options are inadequate, critics say. As a result, too many inmates return home unprepared to do anything but get sent back.

The 200 miles separating the District and Winton creates its own set of problems. Families can have difficulty getting information about relatives' health -- or even their whereabouts -- in a system that imprisons 193,000 nationwide. And the distance drains family resources and isolates inmates from city services that could aid rehabilitation.

Del. Eleanor Holmes Norton (D-D.C.) has scheduled a hearing tomorrow to ask the Bureau of Prisons about what she considers second-class treatment of District inmates. Rivers is high on her list.

* * *

Rivers, classified as a low-security prison, sits on 257 acres a mile outside Winton, the county seat of Hertford County. The county has 22,000 residents and, racially, looks a lot like the District: 60 percent black, 40 percent white. As the first town in North Carolina to be burned by Union troops during the Civil War, the region is steeped in Confederate history, with memorials to soldiers of the South in the town square and Rebel flags displayed in windows.

Now, four of five seats on the Hertford County Commission are held by black residents, and the elected sheriff is black, a source of pride to Commissioner John E. Pierce, who is black. His father died in 1968 without ever casting a ballot.

"He would come to vote, but they said he didn't pass the test, and they told him, 'Come back next year,' " Pierce said. "He was never allowed to vote."

When Rivers was being built in 2001, there were fears that the prison would threaten local safety. But so far, its effects have been positive, particularly for the economy. There are only a few large employers in town, primarily Rivers and a steel mill. Many residents, including Pierce, cross into southern Virginia to find work.



"It's not a lot of high-paying jobs here," said Pierce, who commutes 60 miles north to shipyards in [Newport News](). "It's been an asset."

The region deals with many of the same issues as the District: drugs, robberies, killings.

"We just don't have as many," said Lt. Marty Davis of Hertford's sheriff's department, who doesn't put much stock in rehabilitating those he locks up in the county jail, including D.C. inmates who have completed their sentences at Rivers but have charges pending elsewhere. On a recent evening, Davis shook his head as he looked from the observation room at the people playing cards outside their cells. "By the time they get here, it's too late," he said.

* * *

Darrell Farley, 41, left Rivers in May after a 10-month stay for check fraud. Boasting relatively new facilities and manicured grounds, Rivers looks better than Lorton and the other two federal prisons he's done time in during the past decade.

"It's not a dirty place," said Farley. "But they're not teaching brothers anything. It's just like a warehouse. A lot of people just play basketball, dominos and cards."

The GEO Group, which owns and operates Rivers, did not respond to phone calls and e-mails about the accusations against them. It also denied [The Washington Post]()'s requests to tour the facility, citing safety concerns.

GEO's Web site says prisoners can take classes in life skills, anger management and parenting. It has a law library, a health-care unit and classes for general equivalency diplomas. At a meeting last month in the District that included both former inmates and current inmates piped in via video, several speakers said the programs are inadequate to ensure successful reentry into society.

The drug treatment program is not certified and is harshly criticized by some at the Court Services and Offender Supervision Agency, the federal agency that oversees felons from the District. Training that leads to jobs is limited to a heating and ventilation class that serves only inmates who are 18 to 25 years old. Many inmates are beyond that age group.

Norton and others said the federal government does not fund the programs there as they do in other sites operated by the Bureau of Prisons.

But that's not the only problem at Rivers, according to some who monitor the site.

A prisoner-rights group charged in a class-action lawsuit this year that Rivers ignores serious health needs of inmates.

In August, two former corrections officers at the prison were indicted on charges stemming from the beating of a prisoner in 2006. Two others have pleaded guilty to charges in the case.

About 200 Mexican nationals are held in Rivers for various crimes, and the Mexican Consulate in North Carolina has launched a civil rights investigation regarding health issues and allegations of spoiled food.

* * *

Criminologists say that keeping in touch with family helps inmates maintain goals and stay out of trouble. With so many District inmates at Rivers, several agencies have created direct links between Winton and Washington.

A free bus transports family members to the prison Thursdays through Sundays. To stay in touch with her husband, Reginald Earl, Tracey A. Earl rises to catch the bus at 4:30 a.m. and returns the same evening.

She said guards at Rivers bar visitors when their clothes test positive on an ion scanner, which detects traces of drugs. Prison-related Web sites and blogs are full of claims of false positives and rejection at the prison gates.

"I do understand that, unfortunately, some people do attempt to smuggle illegal drugs and contraband into the facility," she wrote to the

warden in June, "but most of the rejected visitors are law-abiding citizens that miss their loved ones."

Carol Fennelly works to keep fathers in touch with their children. Through her nonprofit Hope House, she runs a program in which dads read books on tapes that are sent to their children. There's a summer camp in which children visit the prison for a week to be with their fathers. The group is secluded in a room, doing art projects several hours each day.

Another program links fathers and their children for an hour via videoconference every few weeks.

At Hope House, which is on a sleepy cul-de-sac in Takoma Park, John Jackson Jr. was talking to his three kids one recent day, chatting about the hottest street gear, their grades, their behavior.

The youngest, 6-year-old J'Quan, looked away as his father spoke, hiding his face from the four-inch square on the computer screen where he could see his father.

"Why y'all keep showing off in school?" Jackson asked. No answer.

"From now on, I don't want to hear nothing but good reports."

Soon, they were telling jokes. J'Quan showed his father a dance and then rapped the lyrics to "The Message," an iconic 1982 rap song.

"Don't push me, 'cause I'm close to the edge," the boy said. "I'm trying not to lose my head."

"That's an old song," Jackson said, throwing his head back in laughter.

This kind of connection, Fennelly said, is priceless and can give a person hope. "They may be criminals," she said, "but they're fathers first."

View all comments that have been posted about this article.

**Post a Comment**

**View all comments** that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2007 The Washington Post Company

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.  06-308 (RBW) |
| ) | |
| DAMON RAWSHAWN DIXON ) | |
| ) | |
| Defendant. ) | |

## ORDER

Upon consideration of Defendant Damon Dixon's Motion for a Judicial Re-designation Transfer Recommendation, the Incorporated Memorandum of Points and Authorities, the Government's response thereto, and the entire record in this case, it is this \_\_\_\_ day of February 2008, hereby

ORDERED that Defendant Dixon's motion is GRANTED, and the Court recommends that the Bureau of Prisons ("BOP") evaluate Mr. Dixon for a re-designation transfer under BOP Program Statement 5100.08, along with the following judicial recommendations:

1. That Mr. Dixon be designated to serve his sentence at a BOP facility where he can participate in the BOP's 500-hour Residential Drug Abuse Treatment Program.

2. That Mr. Dixon be designated to serve his sentence at a BOP facility where he can participate in a plumbing or electrical vocational program.

3. That Mr. Dixon be designated to serve his sentence near to the District of Columbia so he can maintain contact with his family.

_____
THE HONORABLE REGGIE B. WALTON
UNITED STATES DISTRICT COURT JUDGE

cc:   Harley G. Lappin
      Director
      Federal Bureau of Prisons
      320 First St., NW
      Washington, DC 20534